JANVIER, Judge.
Mrs. Albert R. Gosselin, one of the plaintiffs, sustained physical injuries when she fell down the lower portion of a stairway *236 in the establishment in which she was employed in nonhazardous work by a partnership known as Gulf Welding Equipment Company of which Charles O. Stil-well and Donald M. Sarrat were the partners. She and her husband brought this suit for damages against the said partnership and the individual members thereof and, alleging that Stilwell is the owner of the building and, as such, is individually liable, also made him defendant in his individual capacity as owner of the building. Plaintiffs also alleged that Houston Fire & Casualty Insurance Company had issued a policy of liability insurance to the said partnership, and they also made the said insurance company a party defendant.
Plaintiffs alleged that the fall of Mrs. Gosselin was caused by the dangerously defective design of the stairway and by improper lighting, and they prayed for judgment against all the defendants solidarily. Mrs. Gosselin, for her injuries and suffering prayed for judgment for $25,000. Mr. Gosselin, as head and master of the community existing between himself and his wife, prayed for judgment for amounts totaling about $25,000, made up of items for medical and hospital expenses incurred and to be incurred, and for the loss of future earnings of Mrs. Gosselin.
The defendants admitted the issuance by Houston Fire & Casualty Insurance Company of a policy of liability insurance to the defendant partnership, but averred that the face amount of the policy was limited to $25,000 “for each person,” and they further averred that, by the terms of the policy, there were excluded from coverage claims by employees of the said partnership.
The defendants also admitted the occurrence of the accident, but denied that it was caused by improper or dangerous design of the stairway or by defective lighting and they also denied that there was any fault or negligence on the part of the partnership or the individual members, or on the part of the owner of the building, and they especially averred that Mrs. Gosselin was not seriously injured in the accident.
In the alternative that it appear that there was anything dangerous in the design of the stairway or with the lighting, they averred that the proximate cause of the fall of Mrs. Gosselin was her own “negligence in not keeping the proper lookout for what she was doing,” and “in not exercising the care which she should have exercised while descending the stairway in view of all existing conditions.” They also made the following averments:
“(a) That plaintiff was familiar with the stairway and used same daily, during the three months she was in the employ of the defendant; that she was aware of its construction and of the lighting facilities; that she knew that there was a handrail along the stairway; that she suffered dizzy spells on occasions and particularly when looking down from any height such as a stairway; that for a long number of years, she had had trouble with her right knee; that her knee was weak and not always able to bear her weight, frequently giving way on her; that she wore high heels not suited for work in an office and dangerous because of her injured right knee;
“(b) That plaintiff, in spite of the foregoing, descended the steps in such a reckless and careless manner as to cause her to fall thereon; that she was not holding on to the handrail of the stairway which would have kept her from falling; that her knee gave way under her; that she caught her heel on the stair because of the. manner in which she was descending the stairway and not because of any defect therein; that she was not keeping a proper lookout for what she was doing and not exercising the care which she should have exercised while descending the stairway, in view of all the existing conditions.
“(c) That her independent and contributory negligence is a complete bar to a recovery herein, by plaintiffs.”
After a very lengthy trial in which there was made up one of the most voluminous records ever lodged in this Court, there was judgment in. favor of Mrs.. Gosselin solidarily against all defendants in the *237 sum of $3,750, and there was further-judgment in favor of Mr. Gosselin solidarity against all defendants in the sum of $1,250.
All defendants appealed devolutively and suspensively, and both plaintiffs also appealed seeking increases in the amounts awarded.
At the outset two things must be noted: First, the evidence is overwhelming that the lighting was adequate and this charge is, in effect, abandoned, and second, the claim is not based on any decay, or rotten or defective condition of the stairway, the entire charge being that it was improperly and dangerously designed, the allegation on this point reading as follows:
“That the condition of said stairs was in no wise the result of the deterioration or wear and tear, but is attributable to the faulty construction and had architecture used in the construction of said stairs.”
*It thus appears that there are presented for our consideration, so far as the question of liability is concerned, only two questions : Was the design of the stairway such that its use was dangerous to a reasonably prudent person, and, if it was dangerous, was Mrs. Gosselin herself negligent in the manner in which she was attempting to use the stairway?
It is well to note, at the very beginning of this opinion, that only a few days after the fall of Mrs. Gosselin, the stairway was reconstructed by the defendant partnership, or the owners of the building, and characteristics which formerly existed and which are pointed to by plaintiffs as having been dangerous were, to a large extent, eliminated. The fact that this change in design was made is relied upon by counsel for plaintiffs with considerable vehemence and plausibility as indicating, on the part of the defendant partnership, a realization of the dangerous prior design of the stairway and as evidencing possibly an intention to make it difficult to show just what was the prior condition.
The defendants, as we find from the record, were aware of the fact that, on certain prior occasions within the many years during which the stairway had existed, there had been a few other falls. Certainly there was one and possibly two or three others, though the evidence does not make the exact number nor the cause of any of them certain. It is argued from these falls that the steps, as they existed before this alteration, -constituted a threat even to the reasonably careful user.
It is explained by the defendants that it was realized that the stairway was somewhat more steep than was necessary and that it would be easily possible to slightly change the design and thus reduce the quite steep “gradient” which formerly existed and that since there was present at the time a carpenter who was doing other work, he was engaged to reconstruct the stairway and to make it a little less steep and to eliminate certain lack of uniformity which had existed in the widths of the steps and in the heights of the risers.
We are convinced that these changes were not made in any effort to hide anything from the plaintiffs nor from the courts which might later be called upon to consider the matter. In fact the architect, who was later employed by the plaintiffs to examine the stairway after the changes were made, says that all of the old material was used and that he was able to accurately determine just what had been the prior design of the stairway. He prepared a detailed sketch of the stairway showing just what the design had been before the accident and just what it was afterwards and just what changes were made. He says that, in making his examination, he was accorded every courtesy by the partnership and that all necessary cooperation was cheerfully forthcoming.
There is in the record a photograph of the stairway taken after its reconstruction and we think it clearly appears from an examination of that photograph that certainly after the reconstruction there was nothing in the design of the stairway which is now inherently dangerous to a reasonably careful user.
The question, then, is what changes were made and to what extent was the stairway *238 more dangerous before the reconstruction than it is now.
The stairway leads from the ground floor to the second floor. On the second floor there are located space for office supplies, space for a repair department and a ladies’ toilet room.
Mrs. Gosselin and other employees found it necessary to make use of the stairway several times each day. She says that in the three months during which she had been employed she used it at least twice each day.
The stairway was divided into two sections, the lower leading from the ground floor to an intermediate platform and the upper section leading from the platform to the second or mezzanine floor. In going up these steps an employee was required to first ascend the lower section, which consisted of seven steps, and then to turn, at a right angle at the intermediate platform, and ascend the second section consisting of eleven steps. Mrs. Gosselin had descended the eleven steps of that upper section, had turned to her left on the platform, and had started to descend, or was about to descend the second section when she fell and apparently “bounced” down the lower stairway to the first floor. To her left, all the way from the second floor to the ground floor, there was a handrail which could be used by anyone descending or ascending.
Prior to the accident the rake or slope or gradient of the lower section was at an angle of SO degrees, whereas after the accident and the reconstruction of the steps, this gradient was reduced to 40 degrees. To illustrate in a way which may possibly more easily be understood, the height from the ground floor to the intermediate platform is 4' 4". The foot of this lower section of stairway, consisting of seven stairs, was 4' 4" farther out than the edge of the platform. After the reconstruction, the foot of the lower was moved out so that this section then extended 5' 4" out from the intermediate platform or one foot further than it had previously extended.
The record also shows that the upper section of the stairway, which leads from the intermediate platform to the second or mezzanine floor, was rather steep though not quite as steep as the lower section. Prior to its reconstruction this upper section had a gradient of 46 degrees, which was four degrees less steep than that of the lower section. The fact that the gradients of the two sections were different is also pointed to as a possible cause of the fall of Mrs. Gosselin. We think it very clear from an examination of the sketch made by the architect that the slight difference of four degrees was of no importance whatever.
It appears that, in reconstructing the stairway, the “horses” or side pieces between which the treads and the risers are located were used, with the necessary additions, and that each of the treads which also were re-used were extended about an inch and a half further out than previously. The complaint of plaintiffs is that before the accident, not only was the stairway too steep but that the treads were ¿oo narrow, and that there was a dangerous lack of uniformity in the width of the stairway treads and in the height of the various risers, the risers being the pieces of board which extend from the upper part of one tread to the lower part of the other, and which determine the height of each step.
When we examine the testimony of the architect and compare it with his sketch of the profile of the lower section of stairway, we find that his testimony and his sketch agree. Starting from the ground floor, we find that the first tread was 7lf¿' wide, the second 7%", the third 7%", the fourth 7%", and the next 7%", so that in the width of these steps we find that there was a one-quarter inch difference between the narrowest and the widest.
When we come to examine the testimony and the sketch concerning the risers, we find that the lowest riser ws 8", the next 77/s", the next 8the next 7%", the next &Vá"> and the next 8", so that the difference in the height of the steps between the lowest and the highest was three-eighths of an inch.
*239 It is true that there were slight irregularities in the treads and risers of the upper section, and it is also true that the upper section was not quite so steep as the lower, but we do not think that this added substantially to the danger of the use of the entire stairway by a person exercising even ordinary care.
From these figures and from the testimony of most of the witnesses, especially from that of the architect placed on the witness stand on behalf of plaintiffs, we conclude that the treads of the steps were rather narrow and that there were slight irregularities in the widths of the treads and in the heights of the risers, and that the slope or gradient of the stairway was a little more precipitous than is usual. But we cannot convince ourselves, even with the opinion of our Brother of the lower court before us, that the steps were dangerous to any person exercising even ordinary care. In fact, we think that there was little if any danger in their use by a person familiar with them and making any attempt at protection while ascending or descending.
We cannot brush aside the fact that this stairway had remained just as it was for more than twenty years, and it is beyond our comprehension that it would have been permitted to remain as it was had it been as dangerous as plaintiffs would have us believe. Nor can we overlook the fact that Mrs. Gosselin herself had used these stairways several times each day during the more than three months in which she had been in the employ of the defendant partnership.
While it is true that the design of the stairway was not such as would have complied with the specifications set out in the Building Code of 1949, which was the code in effect at the time of the accident, it must be remembered that this stairway had been in existence long before that code came into being, and there was no evidence to show that the stairway did not comply with such building code as may have been in force when it was originally constructed.
In De Latour v. Roosevelt Hotel, Inc., La.App., 1 So.2d 353, we found that the stairway or steps did not comply with the Building Code then in effect and that such a code is not retroactive.
Even if it had been shown that the steps did not comply with the code at the time of their construction, that in itself would not render the defendants liable. In order that there be liability even where there is a violation of such a code it must also appear that an ensuing accident is chargeable to the violation.
The record leaves in our minds no doubt at all that the fall of Mrs. Gosselin resulted not from the rather steep incline of the steps and not from the slight irregularities in the widths and heights of the various steps, but from her own carelessness or inattention.
And we cannot avoid the conclusion that her fall to some extent was caused by her physical condition and by the type of shoe she was wearing. Although she testified, and her testimony is supported by considerable evidence, that a prior accident and operation did not affect her ability to walk without discomfort and without a limp and did not affect at all her ability to descend or ascend the stairway, there is considerable medical evidence which leads us to the contrary conclusion.
It is admitted that she had had a very serious accident eighteen years before the fall in this case and that for quite a long time afterwards she was disabled. Dr. Rufus H. Alldredge who was placed on the stand on behalf of plaintiffs, but with whom plaintiffs had obviously become dissatisfied while he was treating Mrs. Gosselin after this fall, says that he began treating her on January 21, 1952, which was ten days after her fall, and that he found that she had “chronic degenerative arthritis of the knee joint, with either a new bone formation or loose body in the knee joint * * that she informed him that she had had previous difficulty with the knee. He says that she told him that
“ * * * at the age of seventeen she injured the right knee while playing baseball and she was badly dis *240 abled following this injury and was operated on about six months following that injury; and, after operation, she was disabled very considerably for about another year and a half following the operation. That made a total of about two years’ disability resulting from the injury and the operation.”
Dr. Alldredge added that Mrs. Gosselin also told him that after the first operation:
“ * * * she never had been able to get the knee straight following the injury and the operation, but that she had been going along with the knee and had not had any trouble with it until she fell.”
Mrs. Gosselin denies that she told Dr. Alldredge that she had never been able to get the knee straight. However there is other medical evidence which leads us to believe that in the condition in which her knee was prior to the fall with .which we are concerned, she could not have had the normal use of her leg.
Dr. James- T. McQuitty examined X-ray photographs made shortly after the fall and also saw the report on the photographs, and said that
“ * * * It showed the fracture of a spicule of bone that was an arthritic type of spicule that was growing from a portion of the joint, and it showed evidence of the knee having had an old injury with a considerable amount of previous arthritis or osteo-arthrosis associated with the joint.”
We also note that in the record there is some evidence to the effect that' Mrs. Gosselin had, on two earlier occasions, suffered from dizzy spells and that one of these spells had made its appearance while she was descending these stairs at a time before the accident. Mrs. Gosselin denies that she had any such spells.
The shoes which she was wearing were introduced in evidence, and our examination of them creates in our minds the impression that the heels were extremely high. The testimony shows that the inner sides of the heels were 2%" high and the outer sides of the heel were 3%" high. She herself describes the heels as "high”.
We think that it should be noted that Mrs. Gosselin has never been able to say just what it was that caused her to fall. Her testimony leaves no doubt at all that she does not know the cause. She was asked to tell just what had happened, saying:
“That I can’t tell you, because I actually don’t know what did happen. I do remember my left foot going out under me; My heel broke off and I twisted around as I started to fall to grab the hand rail with my right hand for extra support. My leg went up under me. All' I know, when I reached the bottom of the steps that my right leg was twisted up under me and I was sitting on it and could not get up.”
When she was pressed for a reason for the fall she again said:
“As I said, sir> I can’t give you an exact description of what happened because I really don’t know exactly what happened. I know that I slipped. J know that, my left foot went out from in front of me and my right leg went up under me and when I was at the bottom of the stairs I was sitting on my right leg.”
Having referred to the breaking of her heel she was asked whether her heel had caught on anything. She answered:
“Not to my knowledge. As far as I know, there was nothing there to catch your heel on. I didn’t see anything. If there was anything, I don’t know.”
She showed plainly that she had not been making use of the hand rail which she should have used if the steps were too steep for when she was asked what she did when she commenced to fall she said:
“When I fell, then. When I went to reach around for the Tailing the *241 heel was already off my shoe when I went to reach my right hand for the railing. The heel was already off my shoe.”
When we read these statements of Mrs. Gosselin we are impressed with the applicability of the statement made by the Court of Appeal for the Second Circuit in Potter v. Soady Bldg. Co., Inc., La.App., 144 So. 183, 185.
“ * * * Just what caused him to fall, we do not know, nor are we called upon to guess at it. It is incumbent upon him to prove that his fall was due to the defect in the step. * * * ”
Very much to the same effect is a statement made by this Court in Chaix v. Viau, La.App., 15 So.2d 662, 663, as follows :
“We are convinced that the fall was one of the many household accidents which happen each day and which are caused through the fault of no one. The testimony of Mrs. Chaix is very vague, as she is really unable to explain with certainty that the floorboard was the motivating cause of her unfortunate fall. Of course her guess is that the unevenness of the floor boards caused her damage, but we do not believe that the evidence warrants this conclusion.”
That it is generally recognized that in a case of this kind the person who falls must, to some extent, point out the cause of the fall is, we think evident and this rule is well stated by the Supreme Court of Michigan in the case of Davis v. Buss Machine Works, 169 Mich. 498, 135 N.W. 303, 304, as follows:
“It has long since been recognized that falling downstairs, where the mishap was not imputed to unknown or concealed defects, belongs to that class of ordinary accidents which ought to be imputed to the carelessness or misfortune of the sufferer.”
See, also, Knight v. Travelers Insurance Co., La.App., 32 So.2d 508.
Our conclusion is that there is nothing in this record which justifies the conclusion that the fall of Mrs. Gosselin resulted from improper design of the stairway, but, on the contrary, the record leaves the distinct impression that the fall resulted from her own inattention and carelessness.
The judgment appealed from is annulled, avoided and reversed and the suit of plaintiffs is dismissed at their cost.
Reversed.